UNITED STATES v. KESSLER.

No. 13046.

District Court, E. D. Pennsylvania.
Aug. 17, 1945.

Gerald A. Gleeson, U. S. Atty., and Walter A. Gay, Jr., Asst. U.S. Atty., both of Philadelphia, Pa., for plaintiff.

William Harris, of Newark, N. J., for defendant.

KIRKPATRICK, District Judge.

The defendant was convicted upon an indictment charging him with stealing from a truck two cases of cigars constituting an interstate shipment, and he now moves for a new trial on the ground that the evidence was insufficient to support a conviction and that the Court should have directed a verdict of not guilty. No complaint is made of the charge or of any ruling upon any question of evidence.

The government's case depended entirely upon circumstantial evidence.

The testimony was not taken stenographically and I must make up a summary of the evidence as best I can from sources at my command, which consist of my trial notes and my memory assisted by the statements of counsel in their briefs as to their respective recollections of what the witnesses said.

Certain facts are undisputed, or at least the defendant does not deny that there was uncontradicted evidence from which they could be found by the jury. These facts will be stated, without special reference to the testimony of the witnesses by whom they were proved, as follows:

The defendant came to Philadelphia from New York City on October 12, 1944. He went first to the Local of the Teamsters' Union which had previously certified him for one day's employment with another trucking concern in Philadelphia, and was sent by the Local to the offices of the Union Transfer Co., 1000 S. Broad Street, where he procured employment, giving a fictitious name and address and making false statements as to his dependency status and previous military service. He had an explanation for these falsehoods, which the jury may or may not have accepted. He was taken on as a truck driver, was assigned to truck No. 28, and given instructions to pick up various cargoes at nine addresses, arranged in a certain order for convenience and expedition on a so-called pick-up route, after which he was to call the Union Transfer Co. by telephone for additional assignments. He set out with the truck about noon. At some point during his trip, he was joined by an unidentified man who assisted him in loading the truck at some of the stops along the route.

Having completed the nine calls assigned to him, he telephoned to the Union Transfer office and was given a list of five additional calls, the second of which was the Bayuk Cigar Co. at Ninth Street and Columbia Avenue. The defendant, skipping the first of the five stops on his list, went directly to the Bayuk Co. where he received a shipment consisting of packages of cigars, for which he signed a number of bills of lading, two of which were for shipments, of one package each, for customers in Camden, New Jersey. The unidentified man assisted one of the Bayuk employees in loading the cigars on the truck. The defendant left the Bayuk Company with the truck at 3:35.

At 4:15 an employee at a repair garage maintained by the Union Transfer Co., at 24th and Wharton Streets, observed the truck (a covered one with a gate or screen at the back, which had no lock upon it) standing in the street about half a block away, without any driver or other occupant. The truck was not damaged in any way and had about "half a load" of freight upon it. A helper was sent to bring it in to the repair garage, during which operation the truck was continuously under observation of at least one of the employees at the garage. No one was seen to remove anything from it. From the garage it was driven to the Broad Street address of the Union Transfer Co. by a driver who had been sent down to get it.

Upon two points there is a dispute, not as to the testimony, but as to the inferences which can be drawn from it. The points and the testimony are as follows:

1. Were the two Camden cases loaded upon the truck? Groseo, assistant shipper in the Bayuk wholesale department, testified that the defendant and the unidentified man appeared with the truck about 3 o'clock and asked for the shipment. He took them to the retail department where Mr. Geipel was in charge. The defendant was sweating and nervous.

Geipel, shipper in the Bayuk retail department, testified that "thirty some" pack-

ages were to go out on the 10th of October but that the Union Transfer Co.'s truck did not come for them until the 12th. The defendant came into the office at about 3 p. m. where he signed a number of bills of lading for the shipment, including two covering the cases which were to go to Camden. These two bills of lading are in evidence and show that the weight of the two cases were 37 and 39 pounds respectively. The defendant, while signing, appeared very nervous and some one present said, "You're nervous. Don't sign your full name. Just the letter." The cases of cigars were counted as they were taken out. The witness's words were, "We counted them as they went out. Then he (the defendant) came in and signed the bills of lading while we were loading." Groseo testified that he saw "the cigars" loaded on the truck.

There was no direct testimony that the defendant actually saw the shipment on the platform or being loaded on the truck or that he could have seen the platform from Mr. Geipel's office. Neither of the two Bayuk employees who testified checked all the individual packages and neither could testify specifically that he saw the two packages for Camden put on the truck.

2. Had the two Camden cases been removed from the truck before it was found? Davis, a mechanic at the Union Transfer repair garage at 24th and Wharton Streets, was the witness who first saw the abandoned truck. He testified that when it was brought in he looked in the back of it and all he saw there was a couple of barrels and old boxes, but that he could not say whether or not there were any cigars in front of the barrels. He did not see any. Dunn, an employee of Scott Bros., Inc., engaged in repairing Union Transfer Co. trucks, also saw the truck in the street. It was brought to the repair garage by a helper who was not called as a witness. Dunn testified, "I could see everything that was in the truck. There were no cigar cartons in it." On cross-examination he qualified this statement to some extent, although he did not expressly retract it. His entire testimony was somewhat contradictory and unclear.

From the repair garage the truck was driven to the Union Transfer's place of business at 1000 S. Broad Street by a driver who testified that, when he started, the truck was sealed.

Cleaver, chief dispatcher at the Union Transfer Co.'s place of business was present when the truck was finally brought there and testified that he examined the contents and found no cigars. On cross-examination he said that he did not open any containers on the truck and agreed that, consequently, it was possible that some of them might have contained cigars, although he stated that the Bayuk packing was characteristic, that he was familiar with it and that he did not see any Bayuk cases.

The defendant's testimony is not essential to the questions here presented because it may be assumed that the jury chose to disbelieve any part of it inconsistent with their finding of guilt. The gist of it, insofar as it adds anything to what has been stated, is that between 1:30 and 2:00 a stranger asked him where the Union Hall was, that he offered him a lift and that the stranger went with him and helped him load at some places. The defendant called at the Bayuk Cigar Co. out of order because he thought it was the shortest way. A shipment of cigars having been loaded at Bayuk, the stranger left him at 9th Street and Columbia Avenue, after which the defendant proceeded a few blocks to 1800 N. Broad Street, where he became so ill that he was compelled to abandon the truck. He called the Union Transfer Co. from a pay station and acquainted them with the situation and then went to Philadelphia central city and took a train back to New York. The defendant was not asked and did not testify whether he left the keys in the truck when he went to telephone nor did he testify whether the truck was still there when he came back. As to his illness, he said that he had been feeling badly before he reached the Bayuk Co., that he had told the Union Transfer people about this when he called them up to get his second list of stops and that he was given two cigars at the Bayuk Co. office which he smoked and which so aggravated his illness that he was compelled to abandon the truck. He did not again communicate with the Union Transfer Co. and did not come back to Philadelphia until he returned, several months later, with his counsel to meet the charge which is the subject of this prosecution.

1. There is ample evidence from which the jury could find that the two cases consigned to Camden were loaded on the defendant's truck. The defendant, in his

testimony, did not deny that a shipment consisting of a number of cases was loaded upon his truck nor did he contradict the testimony of either of the Bayuk employees as to the circumstances. One of the Bayuk shippers testified that the shipment, which had been waiting for two days for the Union Transfer truck to come for it, consisted of more than 30 cases. Two of the cases came from the wholesale department and were checked as loaded by the shipper from that department. The rest, including the two Camden packages, were counted as they "went out" by the shipper in the retail department, after which the defendant signed "the bills of lading." Inasmuch as the shipper who counted them did not see the cigars loaded it is obvious that by "went out" he meant, taken from his department to the platform. From the platform "the cigars" were loaded on the truck by a Bayuk employee assisted by the defendant's anonymous companion, under the eyes of the wholesale shipper.

The entire transaction was part of one of countless minor business operations of a large manufacturing concern. It was carried out by employees to whom such ordinary routine matters were regularly committed and in the absence of any testimony as to anything out of the ordinary it may be inferred that it was regularly completed. Evans v. Commercial Trust Co., 76 Pa.Super. 304, 310: "It might be as well to say here what we have said before, that the commercial business of the world has long ago outgrown the conditions upon which many of what were once considered basic rules of evidence were founded. If it were now regarded as necessary to have the direct and positive evidence of some witness who of his own knowledge could trace the records accompanying the sale of a small quantity of merchandise from seller to buyer, or from shipper to consignee, it would be impossible for a railroad company to recover its freight, a bank to recover because of an advancement upon a foreign check, a department store to obtain the price of a book it had sold, nor could any such transactions be successfully carried on." See also Loughran v. Thomas Bros. Co., 65 Pa.Super. 302.

In the present case, the delivery of the shipment was under the direction of the two shipping clerks. One of them counted the cases as they went out and bills of lading were given to the defendant to sign, and although the exact number of bills of lading so signed does not appear, there is no reason to question that the proper number of cases were taken out and that bills of lading to correspond were signed. The same considerations apply to the loading. It is, of course, within the realm of remote possibility that in some way these two cases failed to be loaded upon the truck but the testimony that the loading was done by a Bayuk employee and watched by the other shipping clerk made it proper to submit the whole question of delivery and receipt to the jury, which the Court did under instructions.

The bills of lading were properly in evidence, not because the defendant's signing them constituted an admission on his part of the receipt of the goods, but because they were made as a memorandum or record of a transaction in the regular course of business. 28 U.S.C.A. § 695. As such they would have been clearly admissible had the defendant not been required to sign them at all, and it is, therefore, immaterial that the defendant may not have actually seen the boxes loaded or may not have read the bills of lading themselves or known of their contents. In view of all the evidence, I do not think it was necessary for the government to produce a witness who actually checked the two Camden packages as they were loaded on the truck.

2. As to the fact that the cigars were missing from the truck when it was discovered near 24th and Wharton Streets, the testimony of Dunn, taken in connection with that of the other witnesses, particularly Mr. Cleaver, who examined the truck when it was brought back, is sufficient to support a finding upon this point. Although, as pointed out, Dunn's testimony contained contradictions and was not entirely satisfactory, I think, and still think, it was properly submitted to the jury for them to determine the net result of it. It was not a question of credibility but of what he meant. They were carefully instructed that it was for them to say whether he intended to testify that when he looked into the truck he could see its entire contents. If he could, his testimony, that there were no packages of cigars in it, was competent to establish that point.

The jury's verdict, then, may be taken as establishing the facts that the defendant left 9th Street and Columbia Ave-

nue with a shipment of more than 30 cases of cigars, including two cases for Camden, and that 40 minutes later the truck was found abandoned at 24th and Wharton Streets without the defendant and without cigars. From 9th Street and Columbia Avenue to 24th and Wharton Streets it is about four and three-quarter miles, most of the way through down-town traffic. For a truck to cover the route at 4 o'clock in the afternoon of a business day would require at least 20 minutes. The question whether the evidence is as consistent with the defendant's innocence as it is with his guilt or, to put it another way, whether the evidence excludes every reasonable hypothesis except the defendant's guilt, must be considered within the frame supplied by his explanation as to what occurred. He testified that he left the truck standing at 1800 N. Broad Street. The distance from there to 24th and Wharton Streets is perhaps four and one-quarter miles. Referring to the defendant's counsel's brief, the statement is made that from the time the defendant left the truck until it was repossessed 25 minutes elapsed. Into these limitations of time and distance it is impossible to fit any reasonable hypothesis consistent with the defendant's innocence. Either he took the cigars or was an indispensable participant in the theft. According to his testimony no one could possibly have known where the truck was or that he was going to leave it, until the moment he telephoned to the office from 1800 N. Broad Street. Obviously, the removal of some 30 cases of cigars required either another vehicle into which they could be loaded or some place where they could be cached. I should hesitate to try to estimate mathematically the probability that some marauder, supplied with the means of removing or hiding the cigars, would have happened along at exactly the moment the defendant left the truck. It was necessary that he do just that, in order to get the truck to the point where it was found at the time it was found.

Even the idea of an "inside job," apart from the fact that there is no evidence to sustain or even suggest it, is equally improbable. On the defendant's testimony, no Union Transfer Co. employee had any knowledge that the defendant would abandon the truck until he telephoned. The office of the Company is two and one-half miles from 1800 N. Broad Street. Again, it must be assumed that mobile equipment

or a hiding place was in readiness and some confederate waiting somewhere in the neighborhood to receive news of an opportunity which no one had the slightest reason to anticipate.

The motion for a new trial is denied.