UNITED STATES of America

v.

Morris GINN, also known as Michael Gates.

Crim. A. No. 17102.

United States District Court
E. D. Pennsylvania.

Oct. 15, 1954.

W. Wilson White, U. S. Atty., Eugene J. Bradley, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

A. Harry Levitan, Philadelphia, Pa., for defendant.

CLARY, District Judge.

On March 3, 1953, an information was filed in three counts, Criminal No. 17102, charging the defendant, Morris Ginn, with failure to register and be fingerprinted as an alien, in violation of Title 8 U.S.C. § 452,* and with failure to supply the Commissioner of Immigration and Naturalization with his address and other required information for the years 1951 and 1952, in violation of Title 8 U. S.C. § 456, as amended.† A jury, on March 2, 1954, returned a verdict of guilty on each count of the information, and defendant has moved for judgment of acquittal.

■ The first count alleged that defendant, being then a resident in the United States, etc., refused to make application for registration and to be fingerprinted as required under Section 31 of the Alien Registration Act of 1940, 54 Stat. 673,* repealed June 27, 1952. On this count defendant has pleaded the statute of limitations and has argued that the duty to register under this Act was extinguished by its statutory successor, the Immigration and Nationality Act of 1952, 66 Stat. 224, and, if not, the requirement that he register under the

---

* Now 8 U.S.C.A. § 1302.

† Now 8 U.S.C.A. § 1305.

latter Act is unconstitutional in that in so doing he would be forced to reveal incriminating information on his failure to register under the 1940 Act. All these contentions were advanced at the argument on a motion to dismiss which was heard before trial. Judge George A. Welsh, of this court and before whom the motion was heard, denied the motion in an opinion filed on November 16, 1953. In its present posture Judge Welsh's views must be regarded as the law of the case and the same arguments advanced in this motion for acquittal will not, therefore, be now considered.

The second and third counts respectively allege failure to notify the Commissioner of Immigration and Naturalization of defendant's then current address in the periods January 1 to January 11, 1951 and January 1 to January 11, 1952, as required by the Subversive Activities Control Act of 1950, Section 24, 64 Stat. 1012, repealed June 27, 1952. The language of the Act material to these charges is:

"Any alien required to be registered under this title who is an alien resident of the United States on January 1, 1951, and on January 1 of any succeeding year, shall, within ten days following such dates, notify the Commissioner in writing of his current address."

The applicable regulation governing the procedure for such notification reads, insofar as is here material,

"The notification shall be made on Form I–53, Address Report Card, which *may be obtained in any post office* during the notification period, January 1st to 11th inclusive. All entries on the Address Report Card shall be printed clearly in ink or with a dark or indelible pencil except the signature which shall be written in ink or with a dark or indelible pencil. Such card shall not be bent, folded, creased, torn or mutilated in any way. The card shall be signed by the alien or parent or guardian

and *handed to a postal clerk* at any United States Post Office during the notification period, January 1st to 11th inclusive. Such card will be submitted to the Commissioner of Immigration and Naturalization by the Post Office officials," 16 F.R. 11065,[1] October 8, 1951. (Emphasis added.)

The Government and defendant at the trial entered into a stipulation that defendant was an alien required to register under the 1940 Act, that he had failed to so register or apply for registration and, in short, all the facts which would have been admitted by a plea of guilty to Count 1. It was also stipulated that defendant was an alien required to notify the Commissioner of his current address under the Subversive Activities Control Act of 1950 for both of the years 1951 and 1952. It was further stipulated that defendant is an alien required by the Immigration and Nationality Act of 1952 to register thereunder and, after having been advised by his attorney that he was required to present himself for registration, did so present himself and said registration was refused until the appropriate action for failure to register under the 1940 Act could be decided upon.

The evidence presented to the jury and which it could have believed in reaching its verdict on the respective counts was as follows. The certification of the Acting Chief, Records Administration Branch, Administrative Division, of the Central Office, Immigration and Naturalization Service, that he is the custodian of any and all registration records required to be filed with the Commissioner under the Act here involved; the certification related that a diligent examination and search had been made of said records for any record of the filing of an Address Report Card by defendant for the years 1951 and 1952 and that no such record appeared in said files. There were also these facts in the stipulation from which inferences unfavorable to

1. See earlier regulation 8 C.F.R. 170.6 (1949).

defendant could be drawn; that he failed to register under the Act of 1940 and he did not attempt to register under the Act of 1952 until advised by his attorney to do so. After introducing the record custodian's certification the Government rested.

The defendant then took the stand in his own behalf and testified that in January of 1951 an attorney he had consulted on the matter had sent him an Address Report Card and that he had filled it out as the instructions thereon directed. He was at that time a newspaper carrier which occupation required him to be on the job very early in the morning. On his way to work one morning at about 1:45 A.M. defendant testified that he stopped outside the William Penn Annex of the Philadelphia Post Office, located in this Court House, hurried into the building, stopped at the first open, lighted, counter window he encountered and either laid the card on the counter or handed it to the man then behind the barred window. He could not remember whether there was anyone attending the window or not, which window it was, or even generally on what date in January this occurred, whether in the first or last half of the month. Ginn then went on to testify that in 1952 he was employed as a milk route deliveryman, which also involved early morning working hours; that sometime before January 7, 1952, his brother procured for him an Address Report Card, which he filled out, and that on his way to work at about 3:45 A.M. he stopped his truck outside the main Philadelphia Post Office, located at 30th and Market Streets. He again, so he testified, hurried into the building, proceeded to the nearest open counter window, and either laid the card on the counter or handed it to an individual behind the window. He again could not remember if there was in fact some one attending the window or which window he approached. Ginn then hurried out of the building. Defendant's wife took the stand but her testimony added little beyond her statement that she had seen the cards which had been procured for Ginn and that she was concerned about the filing thereof in that defendant had not been registered under the 1940 Act.

The jury demonstrated by its verdict that it did not believe that defendant filed the cards. It also could draw unfavorable inferences from his related account of the casual manner in carrying out these transactions and his ostensible failure of memory with respect to an act which was, or should have been, of considerable importance and concern to him.

■ In support of his motion as to the second and third counts of the information defendant first argues, albeit not very strenuously, that the Government's case totally failed in proving criminal intent. A reading of the statute under which these counts were laid makes it very plain that intent is not an element of the offense thereby created. The proscribed omission is *malum prohibitum* and bare proof that said omission occurred brings into existence criminal liability under the sanctions set out in the statute. See Landen v. United States, 6 Cir., 299 F. 75, 78; United States v. Gunn, D.C., 97 F.Supp. 476, 480. If this were not patent under the 1940 Act, as amended, it is made perfectly plain in the successor section in the 1952 Act, 8 U.S.C.A. § 1306, wherein simple failure to notify calls for criminal penalties but willful or not reasonably excusable failure to notify may result in deportation.

■ Defendant's main argument, however, is based on the rule relating to conviction on wholly circumstantial evidence as laid down by the Third and other Circuits. This rule is stated in two different ways. "In order to justify a conviction of crime on circumstantial evidence it is necessary that the directly proven circumstances be such as to exclude every reasonable hypothesis but that of guilt." United States v. Russo, 3 Cir., 1941, 123 F.2d 420, 423; United States v. Laffman, 3 Cir., 1945, 152 F.2d 393, 394; United States v. Tatcher, 3

Cir., 1942, 131 F.2d 1002, 1003. " ' "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused * * * " ' " Paul v. United States, 3 Cir., 1935, 79 F.2d 561, 563, quoting Yusem v. United States, 3 Cir., 1925, 8 F.2d 6, United States v. Gasomiser Corporation, D.C.Del.1948, 7 F.R.D. 712. To avail himself of the benefit of this rule defendant argues, as he necessarily must, that the only evidence produced by the Government established no more than the single fact that a search was made in the Washington files of the Immigration and Naturalization Service and that no Address Record Cards filed by Ginn were then and there found. Assuming, arguendo, that was all the testimony before the jury in the Government's behalf, a troublesome and disturbing problem is posed. If the rule, stated in either form, is to be interpreted precisely as the words read and if such interpretation is to be inflexibly applied, then the burden of the Government in a number of types of prosecutions has been immeasurably increased. The statute on which this prosecution was undertaken is perhaps an extreme example. There seems to be no other practicable and feasible means of proving that a Record Address Card was not filed (other than out of the defendant's mouth) than to show that it is not present at the place where it would ordinarily and almost inevitably be, had it been filed. The alternative is for a government agent to accompany every alien during every minute of the eleven-day filing period so that the agent can testify that no card was handed to any Post Office clerk. It is equally unreasonable to expect the Government to be able to produce every postal clerk who manned every Post Office window within every alien's possible area of travel during the filing period so that there will be testimony that no such card was in fact delivered. These measures to obtain proof clearly are beyond consideration yet anything less would not satisfy the rule if baldly stated and rigidly applied. Otherwise there is always one hypothesis leading to innocence left open and one that must be conceded not to be clearly unreasonable. This arises from the inescapable truth that our governmental machinery is peopled and operated by human beings who, like all others, are not blessed with infallibility. Certainly no one would be ostracized for holding unreasonable beliefs if he asserted that a card presented to one government servant and which must pass through the hands of three or more others who are employees of two different agencies could very possibly be lost, mislaid, or misdirected so that it did not reach its intended destination. Happily, such miscarriages of communication are not common [2] but there are few persons who do not either directly know, or who have not learned from reliable sources, of at least one such occurrence.

The very effective bar to prosecution by the rule, standing alone, is not limited to actions brought under this statute. Income tax evasion actions prosecuted on the net worth theory would be largely foreclosed if the defendant remained mute and the Government was required to negate beyond peradventure of doubt the existence of every source of income which is possible and reasonable as a matter of law. The rule has also been stated to be applicable in the proof of each element of an offense and if proof within the scope of the rule as to each element is not produced the case must therefore fall, United States v. Gasomiser Corp., supra. Hence, where an act is not per se illegal but is punishable only when perpetrated in pursuance of a conspiracy or scheme to defraud, proof of the scheme itself or of the conspiracy both may be an element necessary to conviction. By the very nature of the circumstances under which such motives take shape or agreements arise,

---

2. See Wigmore on Evidence, Sections 95 and 2534.

proof of them is almost necessarily circumstantial. It is rare that there is not a singe conceivable reasonable hypothesis leading to innocence left unstopped. The fact that such actions *are* successfully prosecuted and the existence of comparatively few reported cases in which the rule is invoked as ground for reversal on appeal at least *leads toward* the conclusion that the rule is not applied as its language may lead one to believe it is possible of being applied. A study even of the cases cited and relied upon by defendant leads further toward the same conclusion.

In United States v. Russo, supra, the defendant was charged with possession of goods stolen in interstate commerce. He and his partner operated a garage and also a trucking business. The partner managed the garage and Russo drove one of the three partnership trucks. Russo entered the garage only occasionally, usually only to receive his share of the receipts. The other two trucks, which Russo did not drive, were usually standing parked in the garage. The stolen goods were found concealed in one of these trucks. The partner pleaded guilty to possession. There was no evidence that Russo had been in the garage from the time of the theft to that of the recovery. Defendant's possession was therefore only constructive and that only because he partly owned the truck on which the goods were found. There was no evidence that he had been near that truck. The Government contended that his knowledge of the source of the goods must follow from this implied possession. Judges Maris, Jones and Goodrich, in an opinion by Judge Jones, reversed the conviction. The rule as to eliminating every reasonable hypothesis but that of guilt was quoted and it was stated that the rule had not been satisfied. As to that there can be no dispute on the facts there present. The court went on to state, however, 123 F.2d at page 423, that there was, "an utter want of any evidence as to defendant's knowledge that the property was stolen * * *", and this was also certainly true. This being so an element of the offense was totally unsupported by evidence, a prima-facie presentation of the crime had not been made out and the case should in nowise have gone to the jury. It could also have been said, and the court so intimated, that knowledge could not as a matter of law be found beyond a reasonable doubt where such knowledge had to be based on evidence of constructive or implied possession. It can be seen therefore that though the rule was employed in reaching the result, the same result could have been attained without it and on other grounds which a reader cannot be sure the court did not also weigh.

In United States v. Tatcher, supra, defendant was convicted of concealing assets of his bankrupt partnership estate from the trustee. Books on the conduct of the business were kept up until two and one-half months before the filing of the petition but none were kept in the intervening period. The last book entries showed merchandise on hand of the value of $12,904.06 but the receiver found only merchandise worth $286 on taking possession. The court in an opinion by Circuit Judge Maris reversed and there again stated the rule on circumstantial evidence. Judge Maris went on, however, to mention convictions upheld on a showing of substantial assets just prior to bankruptcy and their absence thereafter. He said, 131 F.2d at page 1003, that none of those were authority for the position taken by the government that "evidence supporting an inference that two and one half months prior to the filing of * * * [a] petition * * * the bankrupt had assets which were unaccounted for after bankruptcy is sufficient to take the case to the jury." Since the only distinguishing element mentioned between that case and those the court refused to follow was the time interval for which there was no accounting the decision is at least open to the interpretation that the court felt again that there was simply reasonable doubt as a matter of law. The same hypothesis leading to innocence remained, i. e. that the assets were legitimately disbursed

in the conduct of the business, regardless of the time interval for which there was no accounting. Of course, as the interval grows smaller and the disappearing assets grow larger, the hypothesis becomes *less* reasonable. It does however remain.

United States v. Laffman, supra, was a prosecution for giving a Local (Selective Service) Board a false certification of occupation in an essential industry. It was not seriously pressed that Laffman himself sent the card in question but the Government did insist that he supplied the prospective employer with the necessary information and caused the latter to execute the card. Laffman never worked a day at the reported occupation, which he admitted, but his name was carried on the company payroll. There was *direct* evidence, though of a very weak character, that the company official charged with the duty of filling out the cards took down the required information during an interview with defendant. Some of the employer's officers had been convicted of violations of the Selective Service Act in that they had committed illegal acts for the purpose of padding the payroll. The crucial question was, of course, did Laffman supply the false information which appeared on the card. The conviction was reversed. Circuit Judge Goodrich in the first paragraph of the opinion sets out the rule relating to conviction on circumstantial evidence. He then reviewed the evidence and concluded, 152 F.2d on page 395, that *"We think the government['s] case is too thin* to rest a conviction upon." There was other than circumstantial evidence to make out the Government's case and the opinion does not again advert to circumstantial evidence. If the court had really grounded its decision on failure to measure up to this rule, then it would be of no consequence that the Government's case was *thin;* it would have been fatally deficient and further review would have been unnecessary. United States v. Gasomiser Corp., supra, 7 F.R.D. at page 721.

The above discussed decisions, and others which have been studied, lend credence to the conclusion that the courts are not so much insisting that every "reasonable" hypothesis leading to innocence be completely closed off but rather that they are keenly aware of the known and recognized dangers inherent in convictions based solely or largely on circumstantial evidence and carefully scrutinize the evidence to determine whether there is a reasonable doubt as a matter of law. There is no doubt that defendants should have the benefit of this cautionary attitude on the part of reviewing courts. Nevertheless, there are inevitably offenses committed, the only evidence of which is circumstantial, but which evidence is available in quantity and quality to a degree which overwhelms a sole remaining hypothesis leading to innocence that may be "reasonable" in the sense that under the mathematical laws of combinations and permutations it *may have occurred* but which reasonable men will be unanimous in rejecting. We think this is such a case.

It is the sole duty of the trial judge when a motion for a directed verdict of acquittal is made in a criminal case to determine whether there is substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt. Bell v. United States, 4 Cir., 1950, 185 F.2d 302, 310. Circuit Judge Soper in his opinion states, "The possibility that a jury may have a reasonable doubt upon the evidence as to the guilt of the defendant is not the criterion which determines the action of the trial judge. The decision on that question is for the jury to make and the rule is the same whether the evidence is direct or circumstantial." Curley v. U. S., 81 U.S.App. D.C. 389, 160 F.2d 229, (and others). The opinion cites with approval the language in the Curley case, supra:

"'The true rule, therefore, is that a trial judge, in passing upon a motion for a directed verdict of ac-

quittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.' "

To the like effect is the case of Roberts v. U. S., 5 Cir., 1945, 151 F.2d 664, 665, which case holds that the weighing of evidence, drawing of inferences, and balancing of hypotheses in criminal prosecution based on circumstantial evidence are functions of jury, and not of trial court.

██ The jury in this case had before it the above related facts and these inferences which were permissible if not compelling. Ginn had not been registered under the 1940 Act for which failure he could be fined $1,000 and imprisoned for six months. He knew that he was required to be so registered at least as early as during World War II. He did not procure an Address Record Card for the 1951 filing until he had consulted an attorney about the matter and one was then sent him. His wife was concerned that it would not be filed and it was necessary for her to repeatedly assure herself by questioning him that it had been filed. He did not remember in what part of January he allegedly filed the 1951 card, though he had just consulted an attorney who must have told him that it must be filed by the 11th. He did not remember whether he handed it to a clerk or whether the clerk ever picked the card off the counter while the regulations required that it be so handed to a clerk. His card for the 1952 filing was procured by his brother and his wife was again required to assure herself that it had been filed. Ginn's memory on the alleged act of filing in 1952 was again just as hazy as that in 1951. He did not attempt to register under the 1952 Act until he was advised to do so by his attorney. All this presents a clear picture of a man who, to say the least, was less than enthusiastic about calling attention to himself or revealing his whereabouts to the Immigration and Naturalization Service. It must be admitted that some of this testimony came from the defendant's case, but he made no motion for acquittal until the close of *all* the evidence and his own testimony, though damaging to himself, can properly be considered. The demeanor of a witness and the probability of his story are themselves important considerations in determining the truth of his statements which the jury may use not only to reject his testimony but to affirmatively infer that another state of facts actually existed. Similarly this Court must consider *all* the evidence in considering a motion for judgment of acquittal, United States v. Gasomiser Corp., supra, 7 F.R.D. at pages 720 and 721, and if the reasonably deducible inferences to be drawn from defendant's evidence are unfavorable rather than helpful he cannot complain.

██ The jury was carefully instructed on presumption of innocence and its effect and on the burden of the Government in presenting the case. It was told that a reasonable doubt is such a doubt as would cause an individual to act or refrain from acting in a matter of importance to his own daily existence. It will be noted that all the evidence pointing to guilt was circumstantial and there was not one shred of evidence which went toward destroying or discrediting the hypothesis that either or both of the cards were lost, mislaid, or misdirected by the government employees who must have handled them if they were filed. The duty of the jury to acquit if it found a reasonable hypothesis leading to innocence was clearly and fully set out in the Court's charge and in the exact language requested by the defendant. The jury plainly did not consider, either alone or in light of the other evidence, that the hypothesis that two cards on two successive years would fail to reach their proper destination was a reasonable hypothesis to adopt, although such a mishap or combination of mishaps is un-

deniably within the realm of possibility. This Court agrees.

An order will, therefore, be entered denying defendant's motion for judgment of acquittal.