UNITED STATES of America,
Plaintiff,

v.

Sylvanus CONQUEST, doing business
as Connie's Express,

and

Westmoreland Metal Mfg. Co.,
Defendants.

Crim. No. 18770.

United States District Court
E. D. Pennsylvania.

Jan. 9, 1957.

W. Wilson White, Warren D. Mulloy, Fred E. Cochran, Philadelphia, Pa., for Interstate Commerce Commission.

Meyer Love, Philadelphia, Pa., for Sylvanus Conquest.

John B. Brumbelow, Philadelphia, Pa., for Westmoreland Metal Mfg. Co.

LORD, District Judge.

The defendant, Sylvanus Conquest, doing business as Connie's Express, was charged in 13 counts of an information with operating as a contract carrier of property by motor vehicle in interstate commerce without a permit issued by the Interstate Commerce Commission authorizing him to engage in such business—all in violation of Title 49 U.S. C.A. § 309(a) [1] and § 322(a).[2]

Westmoreland Metal Mfg. Co., a corporation, was charged with aiding and abetting the unlawful operation of defendant Conquest. Defendant Westmoreland entered a plea of nolo contendere, and at the same time, defendant Conquest entered a plea of not guilty. At the trial before this Court on September 18, 1956, the defendant Conquest offered no evidence. A jury verdict of guilty on all 13 counts resulted, and defendant has duly moved for acquittal notwithstanding the verdict rendered— which motion is now before this Court.

In support of his motion, defendant asserts three grounds: (1) That the evidence is insufficient to support the verdict; (2) That the Government did

---

1. Section 309(a) (1)

"Except as otherwise provided in this section and in section 310a of this title, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business; * * *."

2. Section 322(a)

"Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

not prove defendant to have been a contract carrier; and (3) That the evidence introduced by the Government tended to show the defendant's status to have been that of a common carrier.

The Court is of opinion that the motion should be denied for reasons to appear in the following discussion.

### 1. Sufficiency of Evidence

To prove that the defendant, Sylvanus Conquest, was the carrier in question, the government called as its first witness one John F. Keane, Secretary of the shipper, Westmoreland Metal Mfg. Co. This witness testified that he had brought with him, in compliance with the government's subpoena, certain records of his company which were made in the normal course of business and kept in his custody and control.

In response to requests and questions by the government, designed to prove Count 1 of the information, the witness Keane produced from his aforesaid records a series of documents. These were termed shipping orders by the witness, but described by him as being copies of the original bills of lading. The first indicated that the goods specified in Count 1 had been delivered to Atlantic Furniture Company of Baltimore, by a carrier whom he "presumed to be Taylor's", since the name *Taylors* appeared on the top of the document. Other similar writings likewise indicated deliveries of the several shipments charged in the first count of the information. Although the signatures on the documents were illegible, the witness testified that the memoranda copies indicated that the freight company had delivered the goods to the consignee, said copies having been returned to the shipper's files as indication of proper delivery of the merchandise.

Keane next produced the bill submitted by the carrier requesting payment for the aforesaid shipments, which bill was duly introduced into evidence. There was no name on the bill to indicate who had submitted it, but there was physically attached to the bill the stub of the check issued in payment thereof. Keane testified that it was the shipper's normal business procedure to attach to the bill a check stub, which was in fact a duplicate (or voucher) of the check issued in payment for the submitted bills. In response to questions by the government designed to ascertain whether the bill was a request for payment for the shipments described in the exhibits, the witness testified as to the matching up of the name of the consignee, the nature and number of pieces shipped as shown on the shipping documents, and the bill. The original check issued in payment of the amount of the bill was then produced. It named the defendant, Sylvanus Conquest, as payee, and showed his endorsement on the reverse side.

It was stipulated by counsel that Keane could produce the same type of evidence to prove the shipments in all counts of the information with the exception of Count 11, which was proved separately. The major difference between the proof of the shipment in that count and the others was that in Count 11 the bill of lading listed Sylvanus Conquest as the carrier.

The second and last witness was Martin E. Foley, the District Supervisor, Bureau of Motor Carriers, Interstate Commerce Commission. He testified that he had made an investigation of the transactions in question as part of his regular duties; that in the course of such investigation he obtained copies of bills of lading from the shipper, Westmoreland, copies of statements or invoices allegedly prepared by defendant when he billed the shipper for the transportation performed, and copies of check stubs (vouchers) and cancelled checks in payment of those charges. He identified the exhibits (being the bills of lading or shipping orders, invoices, stub-vouchers, and cancelled checks heretofore described) as being the records obtained in this case by his investigation. He stated that the investigation disclosed "records proving the transportation of the property as described in the information in every instance."

In sum, the evidence consisted as to Count 11 of documents showing a shipment via Connie's Express, an invoice covering the shipment, a check stub or voucher in the amount of the invoice, and a cancelled check of which the stub was a duplicate—the latter showing Sylvanus Conquest as payee and endorser. As to the other 12 counts, the evidence was the same, except that the name Taylors appeared as shipper on the bills of lading, and some checks had been endorsed by Connie's Express.

The uncontradicted testimony of Mr. Foley, based on a search of the District Office, Motor Carriers Division, Interstate Commerce Commission, was that defendant had no operating authority in the form of permit or certificate from the Interstate Commerce Commission which would authorize his transportation of any property in interstate commerce.

That the shipments were made in interstate commerce does not appear to be seriously controverted. The contention of defendant, as to all counts except number 11, seems rather to be that since the shipping orders (bills of lading) bore the name *Taylors*, and since the invoices were anonymous, the government's case cannot support the verdict.

Defendant also argues that the government's case is insufficient in that it rests exclusively upon business records, and is entirely circumstantial. As to the alleged weakness of business records, he cites United States v. Kessler, D.C.E.D. Pa.1945, 63 F.Supp. 964, 965. In that case the defendant was convicted upon an indictment charging him with stealing from a truck two cases of cigars constituting an interstate shipment. Early in his opinion, Chief Judge Kirkpatrick states that "The government's case depended entirely upon circumstantial evidence."

One element of proof was delivery and receipt of the goods, regarding which the court said at page 967:

"The bills of lading were properly in evidence, not because the defendant's signing them constituted an admission on his part of the receipt of the goods, but because they were made as a memorandum or record of a transaction in the regular course of business.   28 U.S.C.A. § 695  *  *  *."

It is unnecessary here to discuss admissibility of business records, in view of the present statute, 28 U.S.C.A. § 1732, and also the fact that no objection was made by defendant to the introduction of such records. The present question, rather, is that of the worth of such evidence, once it has been admitted.

On the latter point, the Kessler opinion suggests that, at page 967:

"The entire transaction was part of one of countless minor business operations of a large manufacturing concern. It was carried out by employees to whom such ordinary routine matters were regularly committed and in the absence of any testimony as to anything out of the ordinary it may be inferred that it was regularly completed. Evans v. Commercial Trust Co., 76 Pa.Super. 304, 310: 'It might be as well to say here what we have said before, that the commercial business of the world has long ago outgrown the conditions upon which many of what were once considered basic rules of evidence were founded  *  *  *.'"

Defendant further cites the case of United States v. Garvey, 2 Cir., 1945, 150 F.2d 767, which affirmed a conviction of transporting stolen goods, of $5,000 value, in interstate commerce. The opinion simply mentions that, as to proof of the statutory element of value, $5,000, the mere invoices would not have been enough in the absence of the evidence as to the manufacturer's custom and practice of verification of the contents of cartons.

In the present case, the government's evidence, viewed after the jury verdict, showed that the shipments were made interstate, that defendant received payment for them, that defendant was unlicensed for such carriage, and that the

defendant performed the transportation in violation of statute.

In the light of the present question, the judicial observation in the Garvey case that invoices alone would not prove particular cartons to have contained merchandise of the value of $5,000 seems to have no great bearing.

■ The objection generally raised as to business records is that of admissibility. Yet it is well known that the practice in this connection has been gradually liberalized, even in the absence of statute. The reason given for that change furnishes one answer to defendant's contention. For instance, Mc-Cormick says that the archaic impediments have been minimized by virtue of the "special reliability" of such records, McCormick on Evidence 599 (1954). The Federal Business Records Act, for that matter, is simply designed "to facilitate admission of records which experience has shown to be quite trustworthy," Korte v. New York, N. H. & H. R. Co., 2 Cir., 1951, 191 F.2d 86, 90, certiorari denied 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652; see Palmer v. Hoffman, 1942, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645.

We hesitate therefore to accept the inference that business records, once they have been admitted into evidence, are a sort of "second class evidence." For that matter, the proposition that one kind of evidence is necessarily better than any other is at least questionable. Quoting Wigmore on Evidence, Chief Justice Maxey pointed out in In re Young's Estate, 1943, 347 Pa. 457 at page 464, 32 A.2d 901, at page 904, 154 A.L.R. 643 that:

> "* * * 'There are no rules in our system of evidence prescribing for the jury the precise effect of any general or special class of evidence. * * * it is out of the question to make a general assertion ascribing greater weight to one class or to the other * * *.' "

Defendant furthermore presses the point that the shipping documents in 12 counts designate Taylors as the carrier, saying:

> "The Government cannot, without producing additional direct evidence, ask the Court or jury to accept as true one part of a business record and as untrue another part of that same record. The equivocal circumstance that payment for the shipments in question was made to Conquest does not negate or overcome the Government's own proof that Taylors was the carrier and not Conquest."

A principle which was established in Elizabethan days, embedded in Bacon's Maxims, supplies the answer: *falsa demonstratio non nocet*—false description does not vitiate, 9 Wigmore on Evidence § 2476 (3d. ed. 1940); see also, for application to a very different factual situation, the leading case of Patch v. White, 1885, 117 U.S. 210, 216, 6 S.Ct. 617, 29 L.Ed. 860.

At the present juncture, it would seem that the jury simply chose to regard the word Taylors as misdescription. It followed an ancient prerogative to "strike the bad, and save the good." Were it not possible so to do, the mere presence of any name on a business record, however fortuitously the name there appeared, would be controlling. In a case like the present one, for example, had someone named Taylor furnished imprinted blanks, bearing his name for advertising purposes, to the shipper, that circumstance (by defendant's line of argument) would incontrovertibly make Taylor the carrier.

Defendant next cites the "strict circumstantial evidence rule prevailing in the Third Circuit." That matter has been dealt with by the Court of Appeals for the Third Circuit in a case ten years more recent than any cited by defendant, i.e., United States v. Ginn, 3 Cir., 1955, 222 F.2d 289, 292. There the defendant had been convicted of, among other things, failing to register and report annually, being an alien. The court remarked:

"In this case we do not need to re-analyze [our former] opinions to see whether there is anything inconsistent between them and the recent comment by the Supreme Court upon circumstantial evidence in tax cases. Holland v. United States, 1954, 348 U.S. 121 [139–140], 75 S. Ct. 127 [99 L.Ed. 150]."

The Court of Appeals then went on to find that a conviction could not be supported by a mere affidavit "that the custodian looked and did not find the cards" required to have been filed.

As noted by the Court of Appeals, the lower court in that case had devoted thoughtful analysis to the circumstantial evidence decisions of this circuit, United States v. Ginn, D.C.E.D.Pa.1954, 124 F.Supp. 658. The three principal ones are first: United States v. Russo, 3 Cir., 1941, 123 F.2d 420 wherein a conviction was set aside because the defendant could not, on the evidence, have known that the stolen goods had been placed in his truck. Then in United States v. Tatcher, 3 Cir., 1942, 131 F.2d 1002, the conviction of a bankrupt for concealing assets was set aside for total lack of evidence that he had concealed assets. The third was United States v. Laffman, 3 Cir., 1945, 152 F.2d 393 wherein a conviction of false certification of occupation to a Selective Service Board was set aside for complete failure of proof to show that defendant had anything to do with the notice sent to the Board.

These cases are the ones most frequently cited for the proposition that:

In order to justify a conviction of crime on circumstantial evidence it is necessary that the directly proven circumstances be such as to exclude every reasonable hypothesis but that of guilt.

Taking that rule even in its most literal form, one of its own elements seems to dispose of defendant's contentions, i.e., that:

"* * * the directly proven circumstances [must] be such as to exclude every *reasonable* hypothesis but that of guilt." (Emphasis supplied.)

■ The documents produced by the shipper, together with the testimony of the witness from the Bureau of Motor Carriers, may be taken as showing that shipments were made in interstate commerce, that defendant was unlicensed, and that defendant cashed 13 checks for 13 shipments in amounts corresponding to anonymous invoices which matched the shipments in every case.

To overcome the obvious inference arising from acceptances of the payments under the circumstances, defendant suggests that

"* * * payments might have been collected by Conquest as agent for Taylors, or assigned to Conquest in a set off between carriers, intrastate revenue as against interstate revenue, or perhaps some other basis as there is nothing in the record to indicate the relationship between Conquest and Taylors."

For all the record shows, however, there may have been no such person or entity as Taylors. It would be no less reasonable to speculate that the shipper was simply using up obsolete, pre-typed shipping memoranda, or that the name Taylors had been inserted on the blanks for some reason known only to the shipper, and purely for the shipper's own convenience.

On the record, then, the Court is of opinion that the uncontradicted documentary evidence, coupled with the direct testimony of the investigator—giving the Government the benefit of inferences to which it is entitled after verdict—excludes all reasonable hypotheses other than guilt.

2. Proof that defendant was a contract carrier and

3. Contention that the Proof showed him a Common Carrier.

■■ These second and third points lend themselves to joint treatment. As

to the latter, there is only one phase of the evidence pointing toward the common carrier status. Such was the testimony of Foley that defendant had advertised in the Philadelphia telephone directory for truck hauls to New York. On the authority of United States v. Contract Steel Carriers, Inc., 1956, 350 U.S. 409, 411, 76 S.Ct. 461, that advertisement is deemed insufficient to show him to have been a common carrier. In the cited case, the United States Supreme Court held that an advertisement offering transportation service without mentioning whether it was contract or common carriage, plus active solicitation of new business, did not justify a finding of holding out to the general public.

On the other hand, the direct testimony of Mr. Foley was that defendant's interstate operation was exclusively for Westmoreland Metal Mfg. Company. The same witness categorized defendant as a contract carrier, since the Bureau's investigation had shown that Conquest carried for no shipper other than Westmoreland.

■ Other elements ordinarily necessary to show common carrier status were entirely missing such as: a showing of the filing of tariffs with the appropriate regulatory body; the offering of services to all shippers at a stated uniform price; and issuance of regular freight bills as required by law (49 C.F.R. 172). See also Slagle, 2 M.C.C. 127, 134; Whitney Contract Carrier Application, 32 M. C.C. 431.

As to the alleged insufficiency of proof of the contract carrier status, the defendant cites 49 U.S.C.A. § 303(a) (15), being § 203 of the Interstate Commerce Act:

"(15) The term 'contract carrier by motor vehicle' means any person which, under individual contracts or agreements, engages in the transportation (other than transportation referred to in paragraph (14) of this section [common carriers] and the exception therein [express companies]) by motor vehicle of passengers or property in interstate or foreign commerce for compensation."

Defendant further cites and sets out Code of Federal Regulations, Title 49, Transportation § 173.2 "Contracts or Agreements to be in Writing."

It is unnecessary, for two reasons, that the latter section be elaborated here. In the first place, the bills of lading could reasonably be considered written contracts, and sufficient to meet the requirement that they be "bilateral and impose specific obligations upon both carrier and shipper * * *"

In any event, if the requirements of the cited sections were not met, such would simply have been a violation of the regulation rather than a fact determinative of status. In Whitney Contract Carrier Application, 32 M.C.C. 431, for instance, Standard Uniform Bills of Lading were used in connection with shipments made via the carrier. Nevertheless, it was decided:

"We are impressed by the fact that applicant, since 1934, has served the same small group of shippers, who number less than 10 * * * On occasions, small services have been rendered for other shippers not under contract, but such occasions do not appear to have been frequent enough to be designated as a practice. In the Craig case we recognized that the specialization indicative of a contract-carrier status might consist of a rigid restriction of even ordinary services to a particular shipper, or at most to a very limited number of shippers. In the instant case * * * the fact that most of the [shippers] * * * have been served continuously since 1934 impels us to the conclusion that applicant may be properly classified as a contract carrier."

The fact of exclusive service to Westmoreland, so far as the testimony shows, points clearly to contract carrier status,

and this question is resolved against the contention of defendant.

For the above reasons, the defendant's motion for judgment of acquittal is denied.